UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

Correction Officer MARITZA
PARRILLA,

    **Plaintiff,**

    - against -

THE CITY OF NEW YORK, MARTIN
F. HORN, individually and in his
capacity as Commissioner of the New
York City Department of Correction;
Warden KATHLEEN MULVEY; Deputy
Warden ANDREW PERIERO; Assistant
Deputy Warden JACQUELINE
BRANTLEY; and Captains EVELYN
GONZALEZ and VALERIE FEREBEE,

    **Defendants.**

------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 8314 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2/16/11_

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

    Maritza Parrilla, a recently retired employee of the New York City

Department of Correction ("DOC"), brings this action against the City of New

York, Commissioner Martin F. Horn, Warden Kathleen Mulvey, Deputy Warden

Andrew Periero, Assistant Deputy Warden Jacqueline Brantley, and Captains

Evelyn Gonzalez and Valerie Ferebee (collectively, "Defendants"),[1] alleging

employment discrimination and retaliation in violation of Title VII of the Civil

Rights Act of 1964 ("Title VII"), the New York State Human Rights Law[2]

("NYSHRL") and the New York City Human Rights Law[3] ("NYCHRL"). Parrilla

also brings a *Monell* claim against Defendants, pursuant to section 1983 of title 42

of the United States Code ("Section 1983"), alleging that they engaged in a pattern

and practice of retaliation.[4]  Parrilla claims that Defendants discriminated against

---

[1]     Kathleen Mulvey was the Warden of the DOC's Criminal Justice Bureau ("CJB") and responsible for the Bronx Detention Complex Facility ("BXDC"); Andrew Pereiro was the Deputy Warden ("DW") of CJB and reported directly to Warden Mulvey; Jacqueline Brantley was an Assistant Deputy Warden ("ADW"), the Executive Officer at BXDC, and reported directly to DW Pereiro; Evelyn Gonzalez was the Administrative Captain at BXDC, reported directly to ADW Brantley, and was responsible for all personnel matters at BXDC including the scheduling and staffing of Correction Officers; Valerie Ferebee was a captain assigned to BXDC and was Parrilla's direct supervisor. *See* Defendants' Rule 56.1 Statement ("Def. 56.1") ¶¶ 2-9, 27; Plaintiff's Response to Defendants' Rule 56.1 Statement ("Pl. 56.1") ¶¶ 2-9, 27; Complaint ("Compl.") ¶ 17.

[2]     *See* N.Y. Exec. Law § 296.

[3]     *See* N.Y.C. Administrative Code § 8-107.

[4]     Plaintiff failed to address or oppose Defendants' arguments regarding municipal liability or qualified immunity.  As a consequence, plaintiff's Section 1983 claim is deemed abandoned. *See, e.g., Jessamy v. City of New Rochelle*, 292 F. Supp. 2d 498 (S.D.N.Y. 2003) ("'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'") (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).

her on the basis of gender when they awarded two posts to which she applied to two men, both of whom had less seniority. Parrilla also alleges, *inter alia*, that Defendants retaliated against her after she filed discrimination complaints by moving the location of her post, denying her overtime requests, issuing her a parking ticket, and occasionally assigning her to assist at other posts. Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the following reasons, Defendants' motion is granted in its entirety.

## II.   BACKGROUND

The DOC employed Parrilla as a Correction Officer from January 18, 1990 to March 2, 2010, when she retired.[5] In March 2005, Parrilla was transferred to the Bronx Detention Complex Facility ("BXDC").[6] From March 2005 through January 2006, Parrilla worked various posts and tours at BXDC.[7] Then, in January 2006, Parrilla bid for, and was awarded, "Post 315-B: Intake Pens" ("Post 315-B"), located in the Criminal Court building.[8] The job description for Post 315-B

---

[5]      *See* Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.

[6]      *See* Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

[7]      *See* Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.

[8]      *See* Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18; 4/9/10 Deposition of Maritza Parrilla ("Parrilla Dep.") at 23.

3

required candidates to be "firearms qualified."[9]  In Post 315-B, Parrilla worked

Monday through Friday from 8:00 a.m. to 4:30 p.m.[10]  Post 315-B covered six

holding pens in the Criminal Court, and required correction officers to supervise

inmates from Rikers Island who were brought there for court appearances.[11]  At

any one time, there were anywhere from 30 to 150 inmates in the holding pens.[12]

       Prior to January 2008, BXDC consisted of two buildings: the

Supreme Court building and the Criminal Court building.[13]  In January 2008, a

third building opened at BXDC known as the Bronx Hall of Justice ("BHOJ").[14]

Upon the opening of the BHOJ, most of the court parts in the Supreme Court and

Criminal Court buildings were consolidated into the BHOJ building.[15]  When the

BHOJ opened, there was a shortage of correction officers to accommodate the

number of posts in the new building, resulting in a high overtime rate and

---

[9]      315-B Job Post, Ex. 4 to Pl. Aff.

[10]     *See* Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.

[11]     *See* Parrilla Dep. at 21.

[12]     *See id.*

[13]     *See* Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.

[14]     *See* Def. 56.1 ¶ 20; Pl. 56.1 ¶ 20.

[15]     *See* Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.

workload for correction officers in the BHOJ.[16]  As a result of the consolidation,

Parrilla's workload in the Criminal Court building decreased, leaving her with

oversight of only five to ten inmates per day.[17]

### A.    Firearms Qualification

In 1998, Parrilla suffered "significant depressive symptoms" and was

treated by a psychiatrist.[18]  As a result of her depression, Parrilla was out on paid

sick leave and worked light duty for a period of time.[19]  The Health Management

Division ("HMD"), the medical arm of the DOC, designated Parrilla as

"psychologically unfit" to carry a firearm.[20]  Parrilla's ID badge was changed to

reflect the fact that she was no longer "firearms qualified."[21]  On April 13, 1999,

Parrilla returned to full duty, but continued to be classified as "psyche unfit" to

carry a firearm.[22]  From approximately 1998 until August 20, 2008, Parrilla was

---

[16]    *See* Def. 56.1 ¶¶ 26-27; Pl. 56.1 ¶¶ 26-27.

[17]    *See* Def. 56.1 ¶ 27; Pl. 56.1 ¶ 27; Parrilla Dep. at 112.

[18]    Affidavit of Maritza Parrilla ("Pl. Aff.") ¶ 3.

[19]    *See* Parrilla Dep. at 55.

[20]    *Id.*

[21]    *Id.*

[22]    Pl. Aff. ¶ 4.  Parrilla's testimony on whether she was aware of her
continuing "psyche unfit" designation is unclear.  At one point in her deposition,

5

designated "psychologically unfit" to carry a firearm.[23]  On August 20, 2008,

Parrilla was evaluated by a HMD psychologist and found to be psychologically fit

to carry a firearm.[24]

In 1996, fitness to carry a firearm became a mandatory condition of

employment at DOC.[25]  Officers hired prior to 1996, however, were

"grandfathered" out of this requirement and did not have to be "firearms qualified"

in order to keep their jobs.[26]

## B.    The Alleged Discrimination

In April 2008, Parrilla applied for two open posts – Post 737-A:

Sanitation/Storehouse ("Sanit/Storehouse") and Post T-527: Key Control ("Key

---

Parrilla discusses an attempt to restore her firearm privileges before 2008 that was
ultimately unsuccessful because her regular treating psychologist was unavailable.
*See* Parrilla Dep. at 57-58.

[23]     Parrilla Dep. at 58-59.

[24]     *See* Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80.

[25]     *See* Deposition of Deputy Warden Andrew Pereiro ("Pereiro Dep."),
Ex. C to Declaration of Larry Martinez, defendants' counsel ("Martinez Decl."), at
38.

[26]     *See id.*

Control").[27]  Both posts performed administrative functions for BXDC.[28]  The

Sanit/Storehouse post was an existing position that became vacant when

Correction Officer Eric Castro retired in September 2007.[29]  Prior to Castro's

retirement, Correction Officer Manuel Rivera was assigned as the "vacation relief"

officer for the Sanit/Storehouse post.  Rivera thus gained knowledge of the post's

responsibilities before the vacancy was created.[30]  The Key Control post did not

exist prior to the opening of the BHOJ.  The Key Control post was responsible for

all of the keys and locks in the new building.[31]  Both positions required fitness to

carry a firearm as a minimum qualification.[32]  A total of seven correction officers

applied for the Sanit/Storehouse post, while five applied for the Key Control

post.[33]  DOC Operations Order 14/91 established four criteria for awarding new

---

[27]     *See* Compl. ¶ 18.

[28]     *See* Pl. Aff. ¶ 8.

[29]     *See* Parrilla Dep. at 66; Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43.

[30]     *See* Def. 56.1 ¶ 43; Pl. 56.1 ¶ 43; Deposition of Miguel Moran
("Moran Dep."), Correction Officer's Benevolent Association Delegate, Ex. G to
Martinez Decl., at 27.

[31]     *See* Def.  56.1 ¶ 41; Pl. 56.1 ¶ 41.

[32]     *See* Def.  56.1 ¶ 47; Pl. 56.1 ¶ 47.

[33]     *See* 737-A Assignment Roster, Ex. I to Martinez Decl., at Bates
Stamp MP01292; T-527 Assignment Roster, Ex. I to Martinez Decl., at Bates

and vacant job assignments: (1) seniority; (2) work performance; (3) attendance record; and (4) special skills, if any, required for the position.[34]

In May 2008, Warden Mulvey awarded the above-referenced posts to two men, Rivera and Correction Officer Osvaldo Betancourt, both of whom had less seniority than Parrilla.[35] Rivera, who was assigned to the Sanit/Storehouse post, had worked for the DOC since February 25, 1991, while Parrilla had been a DOC employee since January 18, 1990.[36] Betancourt, who was assigned to the Key Control post, began working for DOC on August 30, 1990.[37] None of the three candidates (Rivera, Betancourt and Parrilla) had any disciplinary incidents on their work record nor any recorded tardiness.[38] Parrilla had four recorded sick

---

Stamp 01317.

[34]   See 14/91 DOC Operations Order, Ex. L to Martinez Decl., at Bates Stamp MP01289.

[35]   See Def. 56.1 ¶¶ 54-55; Pl. 56.1 ¶¶ 54-55; see also Compl. ¶ 18.

[36]   See 737-A Assignment Roster, Ex. I to Martinez Decl., at Bates Stamp MP01292.

[37]   See T-527 Assignment Roster, Ex. I to Martinez Decl., at Bates Stamp MP01317.

[38]   See 737-A Assignment Roster, Ex. I to Martinez Decl., at Bates Stamp MP01292.

days; Rivera had three; Betancourt had none.[39]  The same form that listed these

details about the candidates also contained a column labeled "GUN QUAL."  Of

the candidates listed for both positions, Parilla was the only one without a "Y"

under that column – she was instead listed as "N PSYCH UNFIT."[40]

On May 28, 2008, Parrilla filed a grievance requesting a formal

investigation of the post assignments, claiming that they "showed a reflection of

favoritism and nepotism" in violation of Operations Order 14/91 and DOC Equal

Employment Opportunity ("EEO") policies.[41]  On June 2, 2008, ADW Brantley

submitted a report in response to Parrilla's grievance, which stated:

> the [BXDC] had a unique situation.  This command was
> preparing for a move from one building to another and this
> task had to be accomplished with utilization of staff.  Be
> advised that the staff at this command were insisting that it
> was against their contract to move anything from one
> building to another.  Staff was also refusing to pack up
> their respective post[s].  Officers Rivera and Betancourt
> both volunteered to assist with the move and did so mostly
> on straight time.  Post 737A was originally assigned to an
> officer that retired.  Therefore, I used the post as a line to
> place Officer Rivera and have him pack up the archive and
> storage areas for the upcoming move.  In addition post

---

[39]  *See id.*

[40]  *Id.*

[41]  5/28/08 Letter from Parrilla to Mulvey, Ex. 1 to Pl. Aff., at Bates
Stamp MP00034-MP00035.

> T527 Key Control did not exist at the time. We were ordering keys and setting up keys and needed someone to assist the Fire Safety Officer . . . with this task. Officer Betancourt volunteered his assistance when no one else would. . . .
>
> It should also be noted that in addition to the normal duties of these post [sic] in the [BXDC] these post [sic] require a lot of outside duties. This would mean that these officers have to be gun qualified. It is my understanding that Officer Parrilla was overlooked because she is psych unfit to carry a weapon.[42]

Also on June 2, 2008, Warden Mulvey sent a memo to Parrilla stating that the Sanit/Storehouse and Key Control posts required applicants to be "firearms qualified" and that Parrilla was not considered for the posts because she did not meet that requirement.[43]

### C.   Parrilla's Complaints

#### 1.   Complaint to the DOC Office of Equal Employment Opportunity

On June 5, 2008, Parrilla filed a complaint with the DOC EEO alleging that the two posts had never before required firearms qualification and

---

[42]     *See* 6/2/08 Memorandum from Brantley to Mulvey, Ex. 9 to Parrilla Aff., at Bates Stamp MP00715.

[43]     *See* Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63; 6/2/08 Memorandum from Mulvey to Parrilla, Ex. I to Martinez Decl., at Bates Stamp MP00033.

10

that Parrilla and another unnamed female officer with seniority were overlooked.[44]
The EEO complaint alleged that the posts were not awarded in accordance with
Operations Order 14/91 because two male officers had been assigned to the post
for more than thirty days in the absence of a variance.[45]  DOC assigned
Investigator Lillian Inesta to investigate these claims.[46]  Inesta began the
investigation by interviewing Parrilla.  In the course of their conversation, Parrilla
told Inesta that she was not firearms qualified and Inesta informed Parrilla that
fitness to carry a firearm was a department-wide policy and grounds for denying
her the posts.[47]

On July 14, 2008, Parrilla signed a form entitled "Voluntary
Withdrawal of Informal EEO Complaints."  In that form, Parrilla stated that "[a]t
this time I wish to withdraw my complaint of gender [discrimination] because I
was not gun qualified for the post."[48]  Parrilla further stated: "[p]lease note that I

---

[44]    *See* 6/5/08 EEO Complaint, Ex. 1 to Pl. Aff., at Bates Stamp
MP00031.

[45]    *See id.*

[46]    *See* Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72

[47]    *See* Def. 56.1 ¶¶ 73-75; Pl. 56.1 ¶¶ 73-75; Deposition of Lillian Inesta
("Inesta Dep."), Ex. F to Martinez Decl. at 13-14, 20.

[48]    6/17/08 EEO Complaint Withdrawal Memorandum, Ex. J to Martinez
Decl., at Bates Stamp MP01335.

was not coerced nor forced to withdraw my complaint, but am doing so of my own free will."[49]  On August 19, 2008, Inesta sent a final report to the acting director of the DOC EEO Office, indicating that because Parrilla had submitted a Voluntary Withdrawal of Informal EEO Complaint form, the EEO Office would respect Parrilla's request and take no further action.[50]  The report, however, indicated that Operation Order 14/91 may have been violated.[51]

## 2. EEOC Complaint

On April 28, 2009, Parrilla filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC").[52]  In that complaint, she

---

[49]     *Id.*

[50]     *See* 8/19/08 Final Determination Memorandum, Ex. 6 to Pl. Aff., at Bates Stamp MP01331.

[51]     Operations Order 14/91 addresses the subject of "Awarding Job Assignments Within a Command." Adopted for the purpose of "ensuring equity in the selection process," one of the promulgated guidelines states that, "[d]uring the period that the job assignment is posted, no single person shall be assigned to that position until the selection process has been completed." But, "[i]f a position must be temporarily filled by one person due to the exigencies of the operation, then a written request substantiating the need must be forwarded to the respective Division Chief for authorization . . . Under these circumstances the individual temporarily filling the assignment shall not be afforded preferential consideration during the selection process." 14/91 DOC Operations Order, Ex. L to Martinez Decl., at Bates Stamp MP01289 (emphasis in original).

[52]     *See* 4/28/09 EEOC Complaint ("EEOC Compl."), Ex. 2 to Pl. Aff., at Bates Stamp MP00141.

12

recounted all of the allegedly retaliatory actions taken against her since the filing of her June 2008 EEO complaint.

Both before and after the filing of the EEOC complaint, Parrilla filed other grievances with DOC personnel. At least seven of these complaints qualify as protected activity under Title VII.[53]

### D.   Alleged Retaliation

Parrilla alleges the following acts of retaliation taken by the DOC in response to her filing of the EEO and EEOC complaints and her multiple grievances.

### 1.   Relocation of Post 315-B to the Basement

On September 22, 2008, Parrilla's Post 315-B was moved from a higher floor to a lower floor in the Criminal Court building.[54] Around that time, the NYPD began using the six holding pens previously used by Post 315-B correction officers.[55] The area that Post 315-B was moved to, known as the "mental health area," has two pens with an "outside door that leads into the

---

[53]     *See infra* Part IV.B.1.a.

[54]     *See* Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85; 3/26/09 Letter from Parrilla to Walsh, Ex. 1 to Pl. Aff. at 3.

[55]     *See* 3/26/09 Letter from Parrilla to Walsh, Ex. 1 to Pl. Aff. at 3; Parrilla Dep. at 89.

street."[56]  Parrilla was the only officer assigned to that area, and complained to her union delegate that she felt unsafe there.[57]  After learning of Parrilla's complaint, Captain Ferebee assigned another officer to the mental health area whenever Parrilla was on duty.[58]  One month later, on October 22, 2008, Post 315-B was moved back to its original floor.[59]

### 2.    Denial of Overtime

Parrilla alleges that following her June 2008 EEO complaint, she was denied the opportunity to work overtime.[60]  On November 21, 2008, Parrilla sent a memo to Warden Mulvey complaining about the inequitable distribution of overtime at BXDC.[61]  In that letter, Parrilla argued that the "Institutional Stick List," which lists correction officers eligible for overtime, was improperly generated in alphabetical order instead of "ascending order, with the least

---

[56]    Parrilla Dep. at 89.

[57]    *See* Deposition of Valerie Ferebee ("Ferebee Dep."), Ex. 6 to Pl. Aff. at 56-57.

[58]    *See id.*

[59]    *See* 3/26/09 Letter from Parrilla to Walsh, Ex. 1 to Pl. Aff. at 3.

[60]    *See* Pl. Aff. ¶ 23; Compl. ¶ 24.

[61]    *See* Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91.

14

accumulated overtime first."[62]  Additionally, Parrilla noted that despite a "weekly volunteer overtime list" maintained by correction officers, the "Administration [was] failing to distribute overtime to Officers according to their perspective [sic] overtime hours . . ."[63]  Attached to Parrilla's letter was a list containing the signatures of twenty-six fellow officers.[64]

On April 24, 2009, Parrilla submitted another complaint to Warden Mulvey concerning the distribution of overtime.[65]  In that complaint, Parrilla asked Warden Mulvey to "review the overtime distribution for Saturday and Sunday day tour [sic] from March 28, 2009 to April 21, 2009," alleging that Captain Gonzalez continued to distribute overtime unfairly.[66]

Toward the end of her career with the DOC, Parrilla began volunteering for overtime more often than she had in the past, with an eye toward

---

[62]     11/21/08 Letter from Parrilla to Mulvey, Ex. 1 to Pl. Aff. at Bates Stamp MP00698.

[63]     *Id.* at Bates Stamp PAR000233.

[64]     *See id.* at Bates Stamp PAR000234.

[65]     *See* 4/29/09 Letter from Parrilla to Mulvey, Ex. 1 to Pl. Aff., at Bates Stamp MP00071.

[66]     *Id.*

her pension, which is calculated at fifty percent of "final average salary."[67] Parrilla earned a total of 17 hours of overtime in 2007.[68] In contrast, Parrilla worked 74.25 hours of overtime in 2008, and approximately 260 hours of overtime in 2009.[69] 218 of the 260 overtime hours Parilla earned in 2009 were accumulated after Captain Gonzalez was transferred out of the facility in September 2009.[70]

### 3.   Change of Shift Time

On October 6, 2008, Parrilla's shift was changed from 7:00 a.m. - 3:00 p.m. to 8:45 a.m. - 5:15 p.m.[71] Warden Brantley allegedly made this change because, after the transition to the BHOJ, there were "less than five" prisoners

---

[67]   *See* Parrilla Dep. at 101; Moran Dep., Ex. G to Martinez Decl., at 73; Defendants' Reply to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment at 7.

[68]   *See* 2007 BXDC Overtime Report, Ex. I to Martinez Decl., at Bates Stamp MP00986.

[69]   *See* 2008 BXDC Overtime Report, Ex. 13 to Pl. Aff.; 2009 BXDC Overtime Report, Ex. 14 to Pl. Aff.

[70]   *See* Pl. Aff. ¶ 25. The 2009 overtime report indicates that the number of total overtime hours for all correction officers rose dramatically in the Fall of 2009, rising from 960 hours hours in August 2009, to 5,254 hours in September 2009. *See* 2009 BXDC Overtime Report, Ex. 14 to Pl. Aff.

[71]   *See* Pl. Aff. ¶ 16; Parrilla was moved from the 8:00 a.m. - 4:30 p.m. shift to the 7:00 a.m. - 3:00 p.m. shift in early January 2008 after requesting a temporary change of tour to allow her time for medical tests. *See* 1/9/08 Memo from Parrilla to Mulvey, Ex. I to Martinez Decl., at Bates Stamp MP01489.

arriving in the early morning hours.[72] Furthermore, there was a gap in coverage between 3:00 p.m. and 5:00 p.m. that needed to be covered.[73] The move was also an attempt to minimize overtime because the DOC was "paying money from 3 o'clock to 5 o'clock when the next shift came in."[74] Parrilla contends that moving her shift time had no effect on overtime because she was relieved by Moran, who worked an 11:00 a.m. to 7:00 p.m. shift, regardless of whether her tour ended at 3:00 p.m. or 5:15 p.m.[75]

### 4.   Parking Ticket

On February 11, 2009, Parrilla was issued a parking ticket while parked in a staff parking lot near BXDC.[76] Although this particular lot was designated for court officers and correction officers without street parking passes, other officers and court personnel also parked there.[77] The parking lot was

---

[72]    12/1/09 Deposition of ADW Jacqueline Brantley ("Brantley Dep."), Ex. 10 to Pl. Aff., at 95.

[73]    *See id.*

[74]    *Id.*

[75]    *See* Pl. Aff. ¶ 16; Moran Dep., Ex. 7 to Pl. Aff., at 44-45.

[76]    *See* Compl. ¶ 8; 3/6/09 Memorandum from Brantley to Mulvey ("Ticket Mem."), Ex. L to Martinez Decl., at Bates Stamp MP00702; Pl. Aff. ¶¶ 29-30.

[77]    *See* Pl. Aff. ¶¶ 29-30; Brantley Dep. at 104-105.

generally very crowded and cars were blocked in in order to fit as many cars as possible.[78]  In early February 2009, ADW Brantley issued an order explaining in detail that all staff that possessed a DOT Placard (authorizing street parking) would no longer be allowed to park in the parking lot.[79]  Officers were given a choice whether to accept or decline the DOT Placard.[80]  On February 10, 2009, ADW Brantley attended roll call at the Bronx Criminal Court building to explain the new policy, and afterward personally spoke to Parrilla explaining the situation.[81]  After roll call, ADW Brantley instructed DOC supervisors to instruct all staff parked in the parking lot with DOT Placards to move their vehicles or be ticketed.  On February 11, 2009, as ADW Brantley left the building for a meeting, she visually inspected the parking lot and found that the only vehicle there with a DOT Placard belonged to Parrilla.[82]  ADW Brantley told Moran, who accompanied ADW Brantley to her meeting to speak with Parrilla.[83]  Moran told

---

[78]     *See* Brantley Dep. at 104.

[79]     *See* Ticket Mem., Ex. L to Martinez Decl., at Bates Stamp MP00702.

[80]     *See id.*

[81]     *See id.*

[82]     *See id.*; Brantley Dep. at 102.

[83]     *See* Brantley Dep. at 102.

Parrilla to move her car or be ticketed.  However, because Parrilla's car was blocked in, it remained in the parking lot.[84]  When ADW Brantley returned from her meeting and saw that Parrilla's car was still in the parking lot, she issued Parrilla a ticket.[85]  On March 2, 2009, Parrilla met with Chiefs Larry Davis and Patrick Walsh to complain about retaliation.[86]  They cancelled the ticket and Parrilla was never ticketed again, despite occasionally parking in the parking lot.[87]

### 5.    Shift Reductions

On four occasions in February and March 2009, Parrilla's post was "shift reduced" for the day.[88]  A shift reduction is when a post is closed down for a shift – for example, if the post is not in use and the correction officer assigned to the post can be used elsewhere.  Often, a correction officer that has been shift reduced is assigned to cover an unexpected vacancy – for example, where another correction officer has called in sick.[89]  Shift reductions are used as a way to reduce

---

[84]    *See id.*; Pl. Aff. ¶ 30.

[85]    *See* Brantley Dep. at 102.

[86]    *See* Pl. Aff. ¶ 31.

[87]    *See id.*

[88]    *See* Shift Reduction Report, Ex. J to Martinez Decl., at Bates Stamp MP0555-0559.

[89]    *See* Pl. Aff. ¶ 18.

the amount of accrued overtime.[90]

It is, however, an established guideline that no "budgeted security posts" are to be shift reduced.[91] Post 315-B is a budgeted security post which is not supposed to be shift reduced.[92] On February 20, 2009, Captain Ferebee nonetheless shift reduced Parrilla's shift and sent her to the BHOJ to fill an unexpected vacancy.[93] Captain Ferebee did so again on March 2, 2009, and on two other occasions in March. On March 26, 2009, Parrilla sent a letter to Chiefs Walsh and Davis complaining about the shift reductions.[94] That same day, Chief Walsh instructed Warden Mulvey "not to shift-reduce [Parrilla] anymore due to all these complaints."[95] Warden Mulvey sent an email to ADW Brantley, Captain Gonzalez, and Captain Ferebee, relaying the command to "not shift reduce

---

[90]    *See id.*

[91]    *Id.* ¶ 19.

[92]    *See id.*

[93]    *See id.* ¶ 20.

[94]    *See id.*

[95]    6/28/10 Deposition of Kathleen Mulvey ("Mulvey Dep. II"), Ex. D to Martinez Decl. at 66.

[Parrilla's] post until further notice."[96]  Thereafter, Post 315-B was not shift

reduced while Parrilla remained employed by the DOC.[97]

### 6.    Designation as Psyche Unfit

On May 15, 2009, an anonymous letter was sent to Warden Mulvey

stating, *inter alia*, that Parrilla was mentally unstable and needed to be evaluated.[98]

The letter stated that co-workers had heard Parrilla "rambling on saying that she

hates the department and if she has to hurt someone she will," and declaring

"[n]ow I have my gun, I'll get them before they get me."[99]  The letter implored

Warden Mulvey to address the situation before something dire happened.[100]  On

May 29, 2009, Parrilla was summoned to HMD for a psychological re-evaluation

at the direction of Warden Mulvey.[101]  After a consultation with Dr. Peter Theo, a

DOC psychologist, Parrilla was informed of the anonymous letter and was told

---

[96]    5/26/09 Email from Mulvey to Staff, Ex. 12 to Pl. Aff., at Bates
Stamp MP00564.

[97]    *See* Pl. Aff. ¶ 21.

[98]    *See* 5/15/09 Letter to Mulvey, Ex. 3 to Pl. Aff., at Bates Stamp
MP01036.

[99]    *Id.*

[100]   *See id.*

[101]   *See* Pl. Aff. ¶ 35; Mulvey Dep. II, Ex. D to Martinez Decl. at 82.

that she was going to be declared psyche unfit.[102]  Another HMD psychologist told

Parrilla that if she submitted a letter from her personal psychologist declaring her

fit to carry a weapon, HMD would remove the psyche unfit finding.  Subsequently,

Parrilla met with her personal psychologist, who sent a letter to DOC stating that

there was no evidence that Parrilla was unstable or a danger to herself or to

others.[103]  On July 13, 2009, Parrilla was deemed psychologically fit to carry a

firearm by HMD, following a cursory evaluation by DOC psychologists.[104]

Notwithstanding Parrilla's clearance to carry a firearm by HMD,

Warden Mulvey denied Parrilla's request to buy a personal firearm.  Warden

Mulvey based her decision on the recently received anonymous letter and the fact

that Parrilla had been designated psyche unfit for most of the previous ten years.[105]

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and

---

[102]   *See id.*

[103]   *See* 6/15/09 Evaluation Notes, Ex. 8 to Pl. Aff., at Bates Stamp MP
00614.

[104]   *See* Pl. Aff. ¶ 36.

[105]   *See* Mulvey Dep. at 88.

22

disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[106] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[107] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law.'"[108] "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[109]

To defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[110] and it "'may not rely on conclusory allegations or unsubstantiated

---

[106]   Fed. R. Civ. P. 56(c).

[107]   *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[108]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[109]   *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[110]   *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

speculation.'"[111]  However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[112]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[113]  However, "'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[114]  "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[115]  Summary judgment is therefore "appropriate only if there is no genuine issue of material fact and the

---

[111]    *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).

[112]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[113]    *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[114]    *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[115]    *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson*, 477 U.S. at 249.

moving party is entitled to judgment as a matter of law."[116]

"'It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[117] "Courts within the Second Circuit have not hesitated to grant defendants summary judgment in such cases where . . . plaintiff has offered little or no evidence of discrimination."[118] Nonetheless, caution must be exercised in granting summary judgment in employment discrimination cases where the employer's intent is genuinely at issue and circumstantial evidence may reveal an inference of discrimination.[119] However, "'[e]ven in the discrimination context, a plaintiff must prove more than conclusory allegations of discrimination to defeat a motion for summary judgment.'"[120] "'[M]ere conclusory allegations, speculation or conjecture will not

---

[116]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[117]    *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001)). *Accord Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) ("[T]he salutary purposes of summary judgment — avoiding protracted, expensive and harassing trials — apply no less to discrimination cases than to . . . other areas of litigation.").

[118]    *Alphonse v. State of Connecticut Dep't of Admin. Servs.*, No. 3:02 CV 1195, 2004 WL 904076, at *7 (D. Conn. Apr. 21, 2004) (quotation marks and citation omitted).

[119]    *See Feingold*, 366 F.3d at 149.

[120]    *Flakowicz v. Raffi Custom Photo Lab, Inc.*, No. 02 Civ. 9558, 2004 WL 2049220, at *8 (S.D.N.Y. Sept. 13, 2004) (quoting *Schwapp v. Town of Avon*,

avail a party resisting summary judgment.'"[121]

**B.    Title VII**

**1.    Discrimination**

Title VII prohibits an employer from "discriminat[ing] against any

individual with respect to [her] compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national

origin."[122] "To withstand a motion for summary judgment, a discrimination

plaintiff must withstand the three-part burden-shifting laid out by *McDonnell

Douglas Corp. v. Green*."[123] "[T]he initial burden rests with the plaintiff to

---

118 F.3d 106, 110 (2d Cir. 1997)).

[121]    *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d
Cir. 2003) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996)
(alteration in original)). *Accord Cameron v. Community Aid for Retarded
Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations
of discrimination, absent any concrete particulars,' are insufficient" to satisfy an
employee's burden in opposing a motion for summary judgment.) (quoting *Meiri*,
759 F.2d at 998) (alteration in original).

[122]    42 U.S.C. § 2000e-2(a)(1).

[123]    *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d
Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  The
*McDonnell Douglas* burden shifting analysis also applies to discrimination claims
arising under the NYSHRL. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1308 n.4
(2d Cir. 1995); *Douglas v. District Council 37 Mun. Employees' Educ. Fund*, 207
F. Supp. 2d 282, 288 n.6 (S.D.N.Y. June 27, 2002).  Therefore, the Title VII
analysis also applies to Parrilla's state discrimination claim.

establish a prima facie case of discrimination."[124]  A plaintiff meets this burden by

showing that: (1) she falls within a protected group; (2) she was qualified for the

position she sought; (3) she was subjected to an adverse employment action; and

(4) the adverse employment action was taken under circumstances giving rise to

an inference of unlawful discrimination.[125]  The Second Circuit has "characterized

the evidence necessary to satisfy this initial burden as 'minimal' and 'de

minimis.'"[126]

Employment actions that the Second Circuit has characterized as

"sufficiently disadvantageous to constitute an adverse employment action include

a termination of employment, a demotion evidenced by a decrease in wage or

salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices . . . unique to a particular

situation.'"[127]  Denial of transfer may constitute an adverse employment action, but

---

[124]     *Cross v. New York City Transit Auth.*, 417 F.3d 241, 248 (2d Cir.
2005).

[125]     *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003); *Byrnie v.
Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001).

[126]     *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381
(2d Cir. 2001).  *Accord Woodman v. WWOR-TV, Inc.*, 411 F.3d 69 (2d Cir. 2005).

[127]     *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (quoting
*Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)) (internal
quotations omitted).

the plaintiff must "proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough."[128] "The denial of a transfer may constitute an adverse employment action at the prima facie step of discrimination analysis when . . . a plaintiff adduces sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability."[129] "[A] jury could find that reducing inmate contact, sometimes to one or two inmates at a time, results in materially safer working conditions. Safe working conditions are an 'objective indicator of desirability.'"[130]

Evidence showing that the plaintiff was treated "less favorably than other similarly situated employees outside [the] protected group" is one method of raising an inference of discrimination.[131] A plaintiff relying on this method to prove the fourth prong of a *prima facie* case "must show that she was similarly situated in all material respects to the individuals with whom she seeks to compare

---

[128]   *Id.* at 164 (internal quotations omitted).

[129]   *Id.*

[130]   *Guzman v. City of New York*, No. 06 Civ. 5832, 2010 WL 4174622, at *19 (S.D.N.Y. Sept. 30, 2010) (quoting *Beyer*, 524 F.3d at 165).

[131]   *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

28

herself."[132]  The question of whether two individuals are similarly situated may present a factual issue for the jury, but "a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met."[133]

Once a plaintiff establishes a prima facie case, a rebuttable presumption of unlawful discrimination arises and the burden of production shifts to the employer to proffer a "legitimate, nondiscriminatory reason" for the challenged employment action.[134]  "If the defendant articulates such a reason, 'the presumption of discrimination drops out,' and the plaintiff must prove that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."[135]  At this final stage of analysis, courts must "examin[e] the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally

---

[132]   *Id.*

[133]   *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007) (citation omitted).

[134]   *Woodman*, 411 F.3d at 76.

[135]   *Id.* (quoting *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001)).

discriminated against the plaintiff.'"[136] In other words, the plaintiff is left with the final burden of proving that discriminatory animus "'was the real reason' for any adverse employment action."[137] Direct evidence is not required; circumstantial evidence will suffice.[138]

## 2. Retaliation

The anti-retaliation clause of Title VII prohibits an employer from "discriminat[ing] against any of his employees . . . because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[139] The *McDonnell-Douglas* burden shifting analysis for discrimination cases applies to retaliation claims as well.[140] To establish a prima facie case of retaliation, a plaintiff must show:

> "[1] that [she] engaged in protected participation . . . under
> Title VII . . . , [2] that the employer was aware of this

---

[136]    *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000)).

[137]    *Cross*, 417 F.3d at 248 (quoting *Schnabel*, 232 F.3d at 87).

[138]    *See Norton v. Sam's Club*, 145 F.3d 114, 119 (2d Cir. 1998).

[139]    42 U.S.C. § 2000e-3(a).

[140]    *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 94 (2d Cir. 2001). Claims of retaliation under the NYSHRL are analyzed in the same manner as those under Title VII. *See Van Zandt v. KLM*, 80 F.3d 708, 714-715 (2d Cir. 1996).

activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action."[141]

If the plaintiff sustains this initial burden, a presumption of retaliation arises and the burden then shifts to the defendant/employer to articulate a legitimate, non-retaliatory reason for the adverse employment action.[142] If the defendant/employer meets this burden, the plaintiff/employee must show that retaliation was a substantial reason for the adverse employment action.[143]

To constitute a "protected activity," a plaintiff must oppose statutorily prohibited discrimination or, at the very least, give the defendant/employer a reasonable basis for concluding that said discrimination is the subject of plaintiff's complaint.[144] The law protects employees when they file a formal charge of

---

[141]    *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (quoting *Cifra v. General Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (ellipses in original).

[142]    *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Slattery*, 248 F.3d at 94.

[143]    *See Hicks*, 593 F.3d at 164.

[144]    *See Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (finding that plaintiff had failed to establish a *prima facie* case of retaliation where plaintiff's complaint did not allege that she was targeted because of her gender and nothing in her complaint could reasonably have led her employer to believe that she was complaining about gender discrimination).

31

discrimination with the EEOC, for example. In addition, the law also protects informal complaints of discrimination, made internally, to supervisors, managers, and other human resources personnel.[145]

In order to be considered "materially adverse," a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.[146] An employment action is "materially adverse" if it is likely to dissuade "a reasonable worker from making or supporting a charge of discrimination."[147] "An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances" that happen in the workplace, because "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."[148] In determining whether retaliatory conduct amounts to an adverse employment action, the courts should consider the actions separately and in the aggregate, "as even minor acts of retaliation can be sufficiently 'substantial in

---

[145]     *See Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001); *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000).

[146]     *See Weeks v. New York State and Hoy*, 273 F.3d 76, 85 (2d Cir. 2001) (citing *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

[147]     *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2008).

[148]     *Id.* at 67-68.

32

gross' as to be actionable."[149]

       The proof required to establish a causal connection between the protected activity and the alleged adverse employment action can be shown either:

> (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.[150]

## IV.   DISCUSSION

### A.   Gender Discrimination Claim

### 1.   Prima Facie Case

       Defendants argue that Parrilla fails to satisfy three of the elements necessary to establish a *prima facie* case of gender discrimination. While conceding that Parrilla is a member of a protected group, Defendants contend that Parrilla: (1) was not qualified for the posts at issue; (2) did not suffer an adverse employment action by being denied the posts; and (3) has failed to produce any evidence supporting an inference of discrimination.

---

[149]    *Hicks*, 593 F.3d at 165 (quoting *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 227 (2d Cir. 2006)).

[150]    *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).

### a.   Firearm Qualification

"Whether an individual is qualified for a job must be assessed in relation to the criteria the employer has specified for the position, not criteria that seem reasonable to the litigant."[151]  The vacancy listings for both the Key Control and Sanit/Storehouse posts list fitness to carry a firearm as a minimum qualification.[152]  Both posts required frequent travel outside the facility, to Rikers Island and other DOC facilities,[153] and DOC policy requires that correction officers assigned to outside posts must be qualified to carry a firearm.[154]

Parrilla argues that she was qualified for the posts she sought because firearm qualification is listed as a job qualification on nearly every DOC post but is not, in actuality, a bona fide job requirement.  As evidence, Parrilla states that during her tenure at the DOC, she served in a number of posts that required

---

[151]   *Sarmiento v. Queens Coll.*, 386 F. Supp. 2d 93, 97 (E.D.N.Y. 2005).

[152]   *See* Sanit/Storehouse Posting, Ex. I to Martinez Decl., at Bates Stamp MP01307; Key Control Posting, Ex. I to Martinez Decl., at Bates Stamp MP01328.

[153]   *See* Mulvey Dep. II at 5-9; Deposition of Correction Officer Osvaldo Betancourt ("Betancourt Dep."), Ex. 4 to Pl. Aff. at 7-8; Deposition of Correction Officer Manuel Rivera ("Rivera Dep."), Ex. 5 to Pl. Aff. at 14-16.

[154]   *See* Pereiro Dep. at 36-37.

firearm qualification without being firearm qualified.[155]  Post 315-B listed fitness to carry a firearm as a minimum qualification when Parrilla applied for the position; yet she was awarded that post despite being designated psyche unfit at the time.[156]  Parrilla was also assigned, in February 2008, to the entrance at the BHOJ, a post that required Parrilla to be firearm qualified, as it involved checking out DOC firearms to incoming and outgoing correction officers.[157]

Defendants, in turn, distinguish Parrilla's previous posts from the Sanit/Storehouse and Key Control posts because the latter posts required outside travel.  Parrilla proffers evidence indicating that Rivera, who was assigned to the Sanit/Storehouse post, only signed out a DOC firearm on four occasions during the year and a half in which he held the post, despite the fact that he frequently traveled outside the BXDC to get supplies.[158]  Thus, Parrilla has raised a material question of fact as to whether the DOC consistently enforces its firearm qualification policy.

In *Aulicino v. New York City Department of Homeless Services*, the

---

[155]     *See* Parrilla Aff. ¶ 5.

[156]     *See* 315-B Job Post, Ex. 4 to Pl. Aff.; Pl. Aff. ¶ 5.

[157]     *See* Parrilla Aff. ¶¶ 6-7.

[158]     *See* Gun Log, Ex. 12 to Pl. Aff., at Bates Stamp MP7515-7521; Rivera Dep. at 18-19.

Second Circuit reversed a district court that granted defendants summary judgment

on a discriminatory failure to promote claim on the ground that the plaintiff was

not qualified for the job.  The court held that "even if those qualifications could be

interpreted as minimum qualifications from the job posting, a rational jury could

nonetheless conclude that DHS did not in practice consider them part of the 'basic

eligibility for the position at issue.'"[159]  Similarly, a reasonable jury could

conclude that because the firearm qualified policy was inconsistently enforced by

DOC, Parrilla was qualified for the posts.

### b.    Adverse Employment Action

Defendants argue that the failure to assign Parrilla to the two posts

did not constitute an adverse employment action because there was no increase in

salary or benefits associated with either post.[160]  Parrilla claims, however, that both

posts represented a "significant improvement in the conditions of [her]

employment" due to their administrative nature and the substantially reduced

exposure to inmate contact and supervision.[161]  At the time Parrilla applied for the

---

[159]    580 F.3d 73, 81 (2d Cir. 2009) (quoting *Slattery*, 248 F.3d at 91-92).

[160]    *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment ("Def. Mem.") at 6-7.

[161]    Pl. Aff. ¶ 8.

posts at issue, she was supervising inmates at Post 315-B, which she characterized as "dangerous work."[162]  Based on the facts in the record, and viewing the evidence in the light most favorable to plaintiff, Parrilla has demonstrated a material issue of fact as to whether there was an adverse employment action in deciding not to hire Parilla for the Key Control and Sanit/Storehouse posts.

### c.    Inference of Discrimination

To complete her *prima facie* case, Parrilla must show that the circumstances surrounding the adverse employment action give rise to an inference of discrimination.  Defendants argue that Parrilla cannot meet this burden because Rivera and Betancourt, who were both firearms qualified, were not similarly situated to Parrilla.  However, because it is unclear whether firearm qualifications were in fact essential to the job, a material question of fact exists as to whether Parrilla's lack of firearms qualification establishes that she was not

---

[162]   *Id.* ¶ 9.  The precise number of inmates Parrilla supervised on a daily basis in April 2008 is in dispute.  In her Affidavit, Parrilla claims that she "had between 30 and 100 inmates a day" at the time she applied for the posts.  *Id.*  Both parties agree that the number eventually dropped to somewhere between five and fifteen inmates in the Fall of 2008.  However, the precise number of inmates is not relevant, because the record clearly establishes that the posts to which Parrilla applied were not primarily focused on inmate supervision.  *See id.*; Rivera Dep. at 10-20.

similarly situated to Rivera and Betancourt.[163]

Even if a jury could conclude that the difference in firearms

qualification was not a material difference between the candidates, other material

differences – such as performance history – do exist.[164]  For example, the record

shows that Betancourt and Rivera distinguished themselves in the transition to the

BHOJ – while other officers, including Parrilla, refused to assist in the transition.

Betancourt and Rivera, by contrast, "volunteered to assist with the move and did

so mostly on straight time."[165]

Nonetheless, because the burden to establish a *prima facie* case is

minimal, I conclude that Parrilla has met this burden.  Under the *McDonnell*

*Douglas* standard, the burden now shifts to the Defendants to provide a legitimate,

---

[163]    *See Levitant v. City of New York Human Resources Admin.*, 625 F. Supp. 2d 85, 104 (E.D.N.Y. 2008) ("The law does not require the employees to be similarly situated in all respects, but rather requires that they be similarly situated in all material respects.").

[164]    *See, e.g., Trotman v. CBS Radio Inc.*, No. 06 Civ. 3389, 2007 WL 2827803, at *9 (S.D.N.Y. Sept. 27, 2007) ("Among the factors to be considered in determining whether employees are similarly situated are their specific duties, education, seniority, and performance history); *Wang v. N.Y.C. Dept. of Finance*, No. 96 Civ. 5170, 1999 WL 529550, at *19 (E.D.N.Y. July 21, 1999) ("[D]isparity in prior performance history is another differentiating circumstance that defeats [Plaintiff's] claim that she was similarly situated to [comparator.]").

[165]    6/2/08 Memorandum from Brantley to Mulvey, Ex. 9 to P. Aff., at Bates Stamp MP00715.

38

non-discriminatory reason for the contested decision.[166]

### 2.   Evidence of Discriminatory Intent

Defendants articulate four legitimate, non-discriminatory reasons for hiring Betancourt and Rivera. *First*, Parrilla was not qualified to carry a firearm – a prerequisite for the posts in dispute. *Second*, Warden Mulvey testified that both Betancourt and Rivera were instrumental in the transition to the BHOJ. *Third*, as to the Sanit/Storehouse position, Rivera had familiarity with the post, having temporarily served in the position for six months following Castro's retirement and as the vacation relief officer prior to Castro's retirement.[167] *Fourth*, Betancourt had knowledge of the keys for the new building, as he had been involved in the "ordering, storage and making of all keys" for the BHOJ.[168]

"Although 'courts have afforded employers considerable latitude in selecting employment qualifications,' employers may not develop criteria in bad faith or apply those criteria non-uniformly."[169]  Parrilla presents no evidence that

---

[166]   *See Woodman*, 411 F.3d at 76.

[167]   *See* Def. 56.1 ¶¶ 44-46.

[168]   6/13/08 Memorandum from Brantley to Migdalia Ortega, Acting Director of EEO, Ex. I to Martinez Decl., at Bates Stamp MP01311.

[169]   *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 411 (S.D.N.Y. 2006) (quoting *Jackson v. University of New Haven*, 228 F. Supp. 2d 156, 161-62 (D. Conn. 2002).

the firearms qualification was developed in order to exclude female candidates

from promotions or certain posts.  Nor does Parrilla make the claim that the

firearms criteria has been applied in a way that has led to a disproportionate

number of men in certain positions.  Rather, Parrilla posits that the firearm

qualification was not uniformly applied because Post 315-B and other posts she

had held also had that qualification.  DOC argues that Parrilla was not qualified

for the two posts in issue specifically because both posts required outside travel.

The record is replete with references to the DOC's outside travel policy, which

requires all correction officers to carry a firearm while outside of the BXDC.[170]

Parrilla does not challenge the existence of this policy and concedes that Rivera

and Betancourt carried firearms while engaged in outside travel.[171]  The record

establishes that when Rivera and Betancourt left the building on official business,

they either took a DOC firearm or used their own personal firearm.[172]  Thus, it is

not the firearms qualification requirement *per se* that made Parrilla unqualified for

the two posts.  Rather, it was the firearm requirement for outside travel, a

---

[170]    *See, e.g.*, Mulvey Dep. II at 5-9; Pereiro Dep. at 36-37; Brantley Dep. II at 80-82; Moran Dep., Ex. G to Martinez Decl. at 63-64.

[171]    *See* Pl. Mem. at 4-5.

[172]    *See* Betancourt Dep., Ex. M to Martinez Decl. at 24; Pl. 56.1 ¶ 47.

legitimate and reasonable requirement consistently enforced by the DOC, that she could not satisfy.

An inference of discrimination is less plausible when the decision maker being accused of discrimination is a member of the same protected class.[173] Here, two of the three individuals that assigned the posts were women – ADW Brantley and Warden Mulvey.[174]  In the absence of any sworn statements or other admissible evidence suggesting that gender discrimination motivated the denials of assignment, I find that Parrilla has failed to rebut Defendants' legitimate non-discriminatory reason for denying her these assignments.[175]   In sum, no reasonable jury could conclude that Parrilla was discriminated against based on her gender when she was denied the Key Control and Sanit/Storehouse posts.  Parrilla's Title VII and NYSHRL discrimination claims are therefore dismissed.

**B.     Retaliation Claim**

---

[173]     *See Walder v. White Plains*, No. 07 Civ. 0235, 2010 WL 3724464 (S.D.N.Y. Sep. 24, 2010); *Eder v. City of New York*, No. 06 Civ. 13013, 2009 WL 362706 (S.D.N.Y. Feb. 12, 2009).

[174]     *See* Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52.

[175]     *See, e.g., Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) (stating that federal courts should not become "court[s] of personnel appeals" that second guess employer's business judgments (citing *Byrnie v. Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001)).

41

Defendants seek summary judgment alleging that Parrilla has failed to raise a disputed issue of material fact as to two of the four required elements of a *prima facie* case of retaliation – that the alleged retaliation was materially adverse and that there was a causal connection between the protected activity and the adverse actions.

Both parties admit that several of the complaints Parrilla filed constitute protected activity within the meaning of Title VII, the NYSHRL and the NYCHRL. Specifically: (1) the June 2008 EEO complaint challenging the assignment of posts to Rivera and Betancourt; (2) the March 2, 2009 meeting between Parrilla and Chiefs Walsh and Davis wherein numerous allegedly adverse actions were discussed; (3) the March 5, 2009 EEOC complaint raising claims of discrimination and retaliation; (4) the March 23, 2009 complaint to Chief Walsh challenging allegedly retaliatory shift reductions; (5) the March 26, 2009 complaint to Chief Walsh challenging shift reductions; (6) the April 24, 2009 complaint to Warden Mulvey regarding inequitable division of overtime; and (7) the May 6, 2009 complaint to Chief Walsh concerning Parrilla's request for a tour change. Additionally, the DOC knew about Parrilla's complaints, meeting the

42

second prong of establishing a *prima facie* case of retaliation.[176]

Under *Burlington Northern*, an action against an employee will be considered materially adverse if it is likely to dissuade "a reasonable worker from making or supporting a charge of discrimination."[177]  Parrilla contends that the best evidence that the conduct directed at her was likely to dissuade a reasonable worker from making or supporting a charge of discrimination is an anonymous letter signed by "The Officers at The Bronx Hall of Justice" that lauds Parrilla's courage in standing up to the "Administration" and states that the letter is unsigned because the writers fear retaliation.[178]  The letter is, however, inadmissible hearsay and therefore cannot be considered in deciding whether Parrilla was subject to adverse employment actions.[179]

### 1.    Relocation of Post 315-B to Basement

Parrilla argues that the relocation of Post 315-B to the mental health

---

[176]    *Cf. Patane v. Clark*, 508 F.3d 106, 115 (2d Cir. 2007) (knowledge requirement is satisfied by "general corporate knowledge").

[177]    *Burlington Northern*, 548 U.S. at 68.

[178]    4/3/09 Anonymous Letter, Ex. 3 to Pl. Aff., at COBA 00005-00006.

[179]    *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999); *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (stating that a nonmovant "cannot rely on inadmissible hearsay in opposing a motion for summary judgment").

area located in the basement of the Criminal Court building constituted a

retaliatory adverse employment action.  Parrilla contends that by moving the post,

Captain Ferebee jeopardized her safety because she was stationed by herself in an

isolated area.  There is support for the proposition that, in the prison context,

assigning a correction officer to work alone is a sufficiently adverse action to meet

the third prong of the *prima facie* burden.[180]  Here, however, the record shows that

Captain Ferebee assigned a second officer to accompany Parrilla once she notified

Ferebee of her concerns.[181]

When a plaintiff is relying solely on temporal proximity to establish

causation between the protected activity and alleged retaliatory acts, the protected

activity and the adverse employment action must occur "very close[ly]" to each

other.[182]  Captain Ferebee's decision to move Post 315-B to the mental health area

was made on September 22, 2008, more than three months after Parrilla filed her

EEO complaint on June 5, 2008.  Although the Second Circuit does not draw a

---

[180]     *See Hicks*, 593 F.3d at 169 (finding retaliatory scheduling claim
satisfied adverse employment action prong of *prima facie* case where, *inter alia*,
defendant repeatedly required plaintiff, who was a correction officer in a juvenile
facility, to work his shift alone).

[181]     *See* Ferebee Dep. at 57.

[182]     *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

bright line in determining the temporal proximity necessary to establish the required causal nexus, the upper boundary is approximately three months.[183]

Parrilla urges the Court to treat her protected acts as "continuous," relying on *Johnson v. Nicholson*, an Eastern District of New York case.[184]  In *Johnson*, the court found that a jury could find a temporal causal connection between adverse employment actions and the plaintiff's "continuous and ongoing" protected activity.[185]  However, the court was referring to ongoing activity in the plaintiff's federal lawsuit in that case.[186]  Parrilla had not yet filed a lawsuit at the time of the alleged retaliation.  There is no basis here to treat Parrilla's protected acts as continuous because not all of her grievances were directed at prohibited

---

[183]   *See, e.g., Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269, 288 (S.D.N.Y. 2009) (citing *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) ("[D]istrict courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation.")).  Parrilla tries to bridge this gap by pointing to two anonymous letters, sent in August and September 2008, that her supervisors arguably attributed to her.  While these letters may be protected activity of the author, Parrilla is not entitled to rely on the protected activity of others, given that she has consistently denied authorship.

[184]   No. 05 Civ. 2740, 2007 WL 1395546 (E.D.N.Y. May 11, 2007), *aff'd*, 349 Fed. App'x 604 (2d Cir. 2009).

[185]   *Id.* at *19.

[186]   *See id.*

discrimination.  Furthermore, there is nothing linking Parrilla's protected acts to

each other, other than temporal proximity.  Unlike *Johnson*, there is no unifying

lawsuit that could link the protected activities and support a finding of continuity.

Causation, therefore, cannot be inferred from the almost four month span between

Parrilla's protected EEO complaint and the alleged retaliation in moving Post 315-

B.  Accordingly, Parrilla has not satisfied her burden of establishing a *prima facie*

case with regard to the relocation of Post 315-B.  This claim is therefore

dismissed.

### 2.    Denial of Overtime

The Second Circuit has held that the denial of overtime can be a

materially adverse employment action.[187]  However, Parrilla cannot show that she

actually suffered an adverse action because she worked dramatically more

overtime hours in 2008 and 2009 than in 2007.[188]  The letter that Parrilla submitted

---

[187]    *See, e.g., Little v. National Broadcasting Co., Inc.*, 210 F. Supp. 2d
330, 379 (S.D.N.Y. 2002) (noting plaintiff could be subject to an adverse
employment action where he produced evidence that he incurred an actual loss of
income because of lost overtime); *Faggiano v. Eastman Kodak Co.*, 378 F. Supp.
2d 292, 306 (W.D.N.Y. 2005) (finding plaintiff suffered an adverse employment
action where he lost opportunities for earning overtime benefits).

[188]    Plaintiff argues that the "overtime in 2008 was earned prior to the
filing of her [June 5, 2008] complaint with the DOC EEO.  She earned no further
overtime until after Gonzalez was transferred out of BXDC."  Plaintiff's
Memorandum in Opposition to Defendants' Motion for Summary Judgment at 12

protesting overtime distribution contained the signature of twenty-six correction officers who were also affected.  Mindful that "context matters," the fact that this decision affected a large number of employees weighs against finding that it constituted an adverse employment action.[189]

Assuming, *arguendo*, that Parrilla has established a *prima facie* case, the outcome is no different.  Defendants have established that there were two legitimate, non-retaliatory reasons for denial of overtime during the relevant period: (1) the incorrect organization of the institutional "stick list" in alphabetical order, and (2) the administration's efforts to reduce overtime.[190]  In an attempt to undermine Defendants' non-retaliatory reasons, Parrilla argues that Captain Gonzalez assigned overtime without using the stick list at all.[191]  Yet Parrilla offers no evidence that Captain Gonzalez's habit of using a list of "overtime hounds" instead of the stick list when filling unexpected vacancies affected her at all.  The

---

n.2.  This assertion is refuted by the cited overtime records, which show that Parrilla earned 31.05 hours of overtime in June 2008, 12 hours in July 2008, 12 hours in August, and a total of 62.75 overtime hours between September 2008 and September 2009, after which time Gonzalez was transferred out.  *See* 2008 BXDC Overtime Report, Ex. 13 to Pl. Aff.; 2009 BXDC Overtime Report, Ex. 14 to Pl. Aff.

[189]    *Hicks*, 593 F.3d at 165.

[190]    *See* Moran Dep., Ex. G to Martinez Decl. at 31-33.

[191]    Pl. Aff. ¶ 24.

47

overtime opportunities being filled were for the morning shift, when Parrilla was already scheduled to work.[192]  Because Parrilla has failed to rebut Defendants' non-retaliatory reasons, she cannot meet her burden under *McDonnell Douglas*. Accordingly, Parrilla's retaliation claim with regard to the denial of overtime is dismissed.

### 3.    Change of Shift Time

In October 2008, Parrilla's work schedule was changed from 7:00 a.m. - 3:30 p.m. to 8:45 a.m. - 5:15 p.m.  A "simple change in work schedule will not ordinarily rise to the level of a materially adverse action," unless it rises to one when viewed in context.[193]  Parrilla argues that the shift change caused her a hardship but fails to articulate a reason why, other than that she would have less time to volunteer for overtime work.  However, she offers no proof that her overtime hours actually decreased after October, 2008.

Furthermore, Parrilla is also unable to satisfy the causation prong.  As with the relocation of Post 315-B to the mental health area, there was no protected activity that occurred close enough to the change in shift time to infer causation.

---

[192]    Moran Dep., Ex. 7 to Pl. Aff. at 36-38.

[193]    *Lundy v. Town of Brighton*, No. 06 Civ. 6280L, 2010 WL 3257852, at *11 (W.D.N.Y. Aug. 18, 2010).

Parrilla's change of shift time retaliation claim is dismissed.

### 4.    Parking Ticket

The parking ticket that Parrilla was issued cannot be reasonably construed as an adverse employment action under the circumstances of this case. Parrilla was never required to pay the fine, so there was no adverse financial impact. Nor did the ticket preclude Parrilla from parking in that lot in the future, which she did. The issuance of a parking ticket is exemplary of the kind of "petty slights and minor annoyances" that *Burlington Northern* determined were not actionable under Title VII.[194]

In any event, the Defendants provided a non-retaliatory explanation for issuing Parrilla the ticket – namely, that she "wasn't supposed to be parking" in that lot because she had a pass to park on the street. ADW Brantley was instituting a new policy enforcing the parking regulations with the goal of decreasing congestion in the parking lot and freeing up parking spots.[195] And when Parrilla was instructed to move her car, she refused. Although Parrilla may have been blocked in, she made no attempt to ask co-workers to move their

---

[194]    548 U.S. at 68.

[195]    Deposition of DOC Chief Patrick Walsh, Ex. H to Martinez Decl. at 16.

49

vehicles so she could move hers. Parrilla has provided no evidence to rebut the contention that she was the only individual with a DOT Placard in the parking lot on February 12, 2009 when the ticket was issued. Because this parking ticket incident cannot support Parrilla's retaliation claim, it is dismissed.

### 5.    Shift Reductions

The four shift reductions cannot be considered materially adverse employment actions. Though Parrilla's job responsibilities changed on the four days when the shift reductions took place, there was no corresponding decrease in wages, benefits, or in any other terms of her employment. And, context matters.[196] The alleged incidents giving rise to this case took place in the tumult of the BHOJ opening. By Parrilla's own admission, after the transfer of several court parts to the BHOJ in the Fall of 2008, the number of inmates Parrilla was assigned to supervise at Post 315-B dropped to between five and fifteen a day.[197] Asking Parrilla to assist at other, busier posts on four occasions cannot be characterized as materially adverse. Parrilla's shift reduction retaliation claim is therefore dismissed.

---

[196]    See *Hicks*, 593 F.3d at 165 ("[C]ontext can diminish as well as enlarge material effect.").

[197]    See Pl. Aff. ¶ 9, n.1.

### 6.    Designation as Psyche Unfit and Request for Personal Firearm

Parrilla was designated as psyche unfit following the DOC's receipt of an anonymous letter that accused Parrilla of being unstable and making threats. The HMD memo re-designating Parrilla as once again fit to carry a firearm, dated July 13, 2009, indicates that

> A psychological or medical evaluation resulting in a determination that an employee is 'fit' to possess a firearm does not constitute an immediate mandate for the return of such firearm to the employee. The ultimate authority for the return of an employee's firearm remains with the employee's Commanding Officer, pursuant to the provisions of References 'A' and 'B'.[198]

Accordingly, the decision whether to grant Parrilla's firearm request was at the discretion of Warden Mulvey alone. Parrilla has not rebutted the non-retaliatory reason proffered by Defendants – that Warden Mulvey did not approve the request because the recent anonymous letter and Parrilla's checkered psychological history raised too many red flags to justify permitting Parrilla to carry a weapon.

### 7.    Acts in the Aggregate

The alleged instances of retaliation must be analyzed individually and

---

[198]    7/13/09 HMD Memorandum, Ex. K to Martinez Decl.

in the aggregate to determine whether the *Burlington Northern* standard is met.[199]

From the preceding discussion, it is apparent that the alleged acts of retaliation did

not result in any adverse employment action, when each is viewed in isolation.

The retaliatory acts are not materially adverse when viewed in the aggregate,

either.  They are too minor and too attenuated in time to be considered

"sufficiently substantial in gross as to be actionable."[200]  In sum, all of the alleged

retaliatory acts either fail to meet Parrilla's initial *prima facie* burden or have been

rebutted by legitimate non-retaliatory reasons.  Accordingly, the retaliatory acts

alleged by Parrilla do not support a claim of retaliation, when viewed individually

or collectively.  Parrilla's Title VII and NYSHRL retaliation claims are therefore

dismissed.[201]

## V.   CONCLUSION

---

[199]   *See Hicks*, 593 F.3d at 165.

[200]   *Id.* (internal quotation omitted).

[201]   Courts "have recently determined that claims under NYCHRL require 'an independent liberal construction' and are no longer 'co-extensive with [its] federal counterparts.'"  *Guzman v. City of New York*, No. 06 Civ. 5832, 2010 WL 4174622, at *80 (S.D.N.Y. Sept. 30, 2010) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).  I therefore decline to exercise supplemental jurisdiction over Parrilla's claims under the NYCHRL, pursuant to 28 U.S.C. § 1367(c)(1), because State courts are the superior venue to develop the new analytical framework required for NYCHRL claims.  Parrilla's NYCHRL claims are dismissed without prejudice.

For the foregoing reasons, Defendants' motion for summary judgment is granted. The Clerk of the Court is directed to close this motion (Docket No. 24) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            February 16, 2011

53

## - Appearances -

**For Plaintiff:**

Susan B. Egan, Esq.
Egan Law Firm
112 Madison Avenue, 3rd Floor
New York, New York 10016
(212) 619-8456

**For Defendants:**

Larry R. Martinez
Assistant Corporation Counsel
New York City Law Department
Office of the Corporation Counsel
100 Church Street, Room 2-184
New York, New York 10007
(212) 227-3153